All right, I think we are now ready for the second case for this morning, which is actually two appeals arising out of the bankruptcy proceeding of Peregrine Financial Group. So we'll begin. Mr. O'Rourke. Good morning, honorable members of the 7th Circuit Court of Appeals. Your Honor, I represent the plaintiffs in Secure Leverage and the plaintiff in the consolidated case, Robert Miller, Fargo and Gainesville. I'm going to, the court may be aware that we're going to split up the time on our opening argument. I'm going to take eight minutes with respect to those cases. Mr. John Drawhand from New York, who will speak to the commodity question regarding the similarity between Forex trading and other types of instruments that are recognized as protected under the Bankruptcy 761 of Open Friends 4. Members of the 7th Circuit, with respect to Secure Leverage, the plaintiffs in Secure Leverage funded trading accounts with their own funds to utilize Peregrine's trading platform. Those funds were placed in accounts in the customer's name. The customer... Well, wait a minute. Oh, sorry. I want to be clear about this because my understanding, maybe I'm confusing transactions, is that there was, as it were, a master account that Peregrine had with Chase, and the customers deposited into that account, then told the broker, you know, this is what I want to buy, this is what I want to sell, but it was not a segregated account in the customer's name. They were not segregated, Your Honor. And so it was not an account in the customer's name. It was a master account. It was a master account, but the actual funds were accounted for by Peregrine as being in the customer's name. In other words, their statements and all their... Well, that's an internal accounting convention. As far as the actual financial structure, we have a customer, we have the customer giving money to Peregrine, it goes into this master account, Peregrine can perfectly lawfully, you know, draw money off of that account if it exceeds a certain amount to pay whatever it wants to pay, then Peregrine is in turn a depositor with Chase, as I recall. I think the accounts actually, Peregrine, the money was actually, I believe, deposited directly with Chase, Your Honor, by the customers. Into the account of Peregrine, so not into, you know, the Michael O'Rourke account or any such thing. Your Honor, you're absolutely right. All right. And so to see if... Mr. O'Rourke. Yes, Your Honor. Given the bankruptcy court's determination that the appellants were not credible at trial and the statement in the Forex Risk Disclosure that was signed by them that made it clear that the funds could be commingled and in the event of bankruptcy, any funds that help for them could be unsecured creditor claims, how could it be error for the court to determine that they failed to prove the parties intended to create a resulting trust? That's where I'm completely hung up. Your Honor, understood. Two points. With respect to the evidence at trial, it is undisputed that all of the funds which the plaintiffs are seeking returned to them were provided by them. There's also no question that under the contract itself, the customer had full authority to trade those funds. But the thing is, the problem is that they aren't segregated funds. Money is fungible and they're told, I mean, it's certainly possible to have funds and yet have the status of an unsecured creditor in bankruptcy. Those are just two different things altogether. Just because they said, I've got perfect records, I can show I paid $50,000 into this account or whatever they paid in, doesn't tell you secured versus unsecured priority or non-priority debt. They've been told, you're an unsecured creditor in bankruptcy.  There have been cases where there have been, in the Refco case, which is not on the record, there was commingling between all of the trading accounts and the general operating accounts of the debtor. Here, there was no commingling, factually, of the Forex funds which were protected at Chase and never commingled, remained intact. I don't know what you mean by commingling. There's an account in the name of PFG Inc. and the funds go into that account and there is no separate account for each individual. It's quite possible to do that because if you have other types of futures, for example, there are segregated accounts. This wasn't done that way. It's just a different instrument. Different consequences flow if, as unfortunately happened here, there's a bankruptcy. Correct. Your Honor, what's key here is that the funds were not commingled. What do you mean when you say that? They were all in the PFG account because somebody has kept track of how much got paid in and how much got paid out and when somebody goes and buys so many euros or so many rupees or whatever they're buying, that's an internal accounting measure. That doesn't mean that these funds aren't commingled. They are. They're all in one big pot. They're in one big pot. They remained intact. There's no question that the legal title of these funds was placed in Peregrine. As far as ownership, equitable ownership depends on the intent of the party placing the funds. That's your whole argument. I'm not sure what the support is for that based on the district court, first the bankruptcy court, as Judge Rovner points out, bankruptcy court's findings and then the district court's findings about the legal quality of this transaction. The district court finds that it's much closer, it's analogous to the relationship between a depositor and a bank, a debtor-creditor. But the bank account, Your Honor, is a matter of contract and state law. This wasn't a contract? Sure, this was a contract. But this contract did not say debtor-creditor. This contract said you control the funds, the funds that you have in your account can be used for margin, or are to be used for margin in collateral, a collateral pledge to support the margin trading in that account. And, Your Honor, there is no way that a customer can be pledging as collateral funds that are not understood between the pledger and pledgee as being the pledger's property. That is the, that is the. I've always understood that the dispositive characteristic that would distinguish a commodity contract is that they're subject to mandatory segregation of funds. That's correct, Your Honor. Is prohibited. These funds, it would seem, were not segregated. And therefore, that would be the dispositive factor, even without consideration of the other characteristics that we have in the Zellner case. Your Honor, with respect to the question of the funds, they were not segregated. They were separate. They were not put in the operating account of Peregrin. And the other key fact, Your Honor, is that the parties recognized in the contract that the ownership, that all the exercise of ownership of the funds would be in the customer. That under paragraph one of the contract, all trading is directed by the customer. Under paragraph three, margin, the customer said you have to put in more margin and more funds in your account to support the trading. Under the collateral section, it's very clear that the collateral securing or supporting the trades comes from the customer and is considered under the terms of the contract, customer property. As a matter of contract, and as a matter of actual exercise and activity in the account, the customer's traded everything, the customer withdrew and put in money, and- Okay, you're about to run out of your rebuttal time, so- I'm sorry, Your Honor. Let me, if I could yield to Mr. Drohan. I'll let you save a minute, and we'll hear from Mr. Drohan. Thank you. Your Honor, good morning. May it please the court, I'm John Drohan with Drohan LLP, representing the Schaffner Plain and Secure Leverage. If I could start just by briefly clearing up, because your questioning of my colleague related partly to commodities regulation. There's a common conflation regarding what co-mingling means. Even with regulated commodity futures accounts, all client funds are grouped into one depository account, one external depository account, labeled as customer property of client, commodity futures client. The exact same structure exists here with regard to the foreign exchange- The Commodity Futures Trading Commission doesn't think it's the exact same structure at all, thinks that it's particularly given both the contractual relations between the customers and Peregrine, and also the warnings that were issued, or whatever the alert statement saying, should there be a bankruptcy, you may be an unsecured creditor. There's a significantly lower level of protection of customer funds. Well, that's a great point, and I recognize the Commission's position with respect to that. I'm just trying to address the fact that structurally, in practice, there are not individual accounts with each of the outside external depository accounts. There's even in regulated commodity futures accounts that are fully subject to the statutory and regulatory segregation. But you know what the difference is? In the commodities accounts, it would be impermissible for the company to use excess money in the account to pay its own debts, whereas in these accounts, that was perfectly all right. Well, Your Honor, I would respectfully point out that, for example, with the example of the foreign commodity futures regulatory segregation requirements under 30.7 of the CFTC rules, they operate in exactly the same way, in fact, that the Forex accounts worked here. You compute your net liability to foreign futures clients. Any amounts in excess of that are fully available to be used by the broker, okay? So that's unique, and again, regulatory segregation and statutory segregation under 60 of the Commodities Act are not contiguous. The requirements are not the same. 30.7 foreign futures speaks to regulatory separation, not regulatory segregation, and it's clearly enumerated as one of the commodities contracts under 761 of the code. Because they've gone through the extra steps that are necessary for that. I mean, I think you're just trying to shortcut, you know, you're kind of trying to push bankruptcy. I mean, I understand why, of course, you'd like to get paid, but trying to push the bankruptcy law further than, you know, and the similarities further than they'll go. Well, Your Honor, I mean, I would point out the fact that the commission would like the court to believe that this is very nicely settled law. But the truth is that in 2006, National Futures Association, which is Commodity Futures Trading Commission's approved self-regulatory organization, made this statement related to Section 761 that it was not clear. Its application was not clear. Relating to risk disclosure that brokers are required to give, they specifically said, we use the word may not, not is not, on secured creditors because the courts may have to determine this at some point. Interpreting the similar contracts clause of Section 761. So this is properly before the court. This is not well settled. And that's something that again, I think. I don't think any member of this panel thinks you brought a frivolous appeal. But, you know, if that makes you feel better, we understand that there's an issue. But if I could just address. I think Zellner is a problem for you. Yes. Well, Your Honor, I appreciate the opportunity to bring up Zellner. I mean, Judge Thorpe in his decision made two comments that I think need to be squarely addressed. He characterized Zellner as referring that it's not true reasonably to infer that Congress implicitly excluded all unclear transactions from Section 761. Well, that's just not true, respectfully. There are at least two classes of contracts within commodities contracts as defined under the code that are not clear. You have leverage transactions that are not cleared or traded on an exchange. You have trade options, which are neither cleared nor traded on an exchange. But they've been added in in a more formal way, as I recall. You know, whether it's leverage transactions, swaps, you know, or some others. There's nothing like that for these forex or metal contracts. Well, what we would submit is that there's extremely broad language that was included in 2006 under this similar contracts clause. And I think it's important to realize that that clause did not state they have to be similar to contracts for future delivery as the Zellner decision defined. Its language is much broader than that. They refer to any contract agreement option, et cetera, similar to any other contract agreement option or transaction under this paragraph. Well, of course, the whole key thing, if you say similar, whenever you say similar, you have to be saying similar in what respect, you know. And what the commission argues, which I think is something you need to deal with, is the respect is these extra protections that are given for the traders in these various segregation requirements and limitations. Right. Well, that's a great point, and I appreciate you bringing it up. But as I said, looking at all of the other enumerated classes of transactions, contracts, et cetera, within 761, some are not cleared. Some are not exchange traded. Some are subject to regulatory segregation, and some are not. Some are subject to various levels of regulatory segregation. It's important, I think, to make the distinction between statutory segregation under 60 of the Commodities Act and the vast majority of other styles of segregation that is the creature of CFTC regulation. Passed post the 73 when the Commodities Act was passed. So it's up to the commission itself. This is a creature of the commission itself. I see my time is beginning to run out. Your time is waning, but if you'd like to save a little bit for rebuttal, that would be fine. Okay. I would save the remainder for rebuttal. I appreciate your time. Certainly. Thank you. Ms. Puri. Good morning, your honors. May it please the court. Kavitha Kumar Puri here on behalf of Intervenor Appley, the Commodity Futures Trading Commission. And your honors, I'd like to deal with some of the points that my colleague made, and I'm going to deal with them a little bit out of order. But the commission is here today to be heard on the meaning of Section 761 of the Bankruptcy Code, which I believe, as this court understands, was enacted to give effect to customer protections as they exist in the Commodity Exchange Act. The Senate report accompanying the passage of this provision said that it was being passed with two goals, one of which was to give customer claims the highest priority in bankruptcy, quote, consistent with the Commodity Exchange Act, end quote. And then it's cited to the segregation provisions of the Commodity Exchange Act. So similar to really cannot be divorced from the purpose of Section 761, which was to give. Let me just, forgive me for interrupting, but let me just ask you this. Do you think that the characteristics that are discussed in Zellner are not the proper focus and that the only focus should be on whether the funds are in segregated accounts? Yes. I agree that the focus should be whether the funds are in segregated accounts. I think the only way you get to Zellner is if you need to decide the question of whether retail foreign exchange transactions are futures, not whether they are similar to futures. Because similar to in this context really is about how the funds associated with these transactions are treated in the ordinary course of business. That is, if they are cordoned off from the assets of the Futures Commission merchant in the ordinary course of business, they ought to be cordoned off from the assets of the Futures Commission merchant in bankruptcy as well. And you think you can go any further with your arguments than what you just stated? I don't, other than to respond to my colleague's arguments, if this court would like. If this court feels it has no questions for me, I'm happy to cede the rest of my time. I would be happy for you to respond to the arguments that have been made. So taking this issue about commingling first, I think this is fairly easily dealt with. Commingling means something special in the statute. It's whether or not the assets are cordoned off, segregated, held in a specially designated customer account, and barred from being mixed with the assets of the Futures Commission merchant. Here, the assets of the Retail Forex participants were held in a bank account labeled PFG Inc., not labeled for customer funds. And in fact, Peregrine used those assets when it was in excess of its obligations to the Retail Foreign Exchange participants to pay off its own obligations, as both the Bankruptcy Court and the District Court found. And so that is certainly not commingling under any definition. That is commingling under every definition I've heard of, excuse me. And in fact, the fact that it was held in a separate account really has no legal meaning here because the Foreign Exchange Risk Disclosure, Regulation 5.8, specifically says you may be treated as a general unsecured creditor even if your assets are maintained in a separate account, like they were here. So this really isn't the kind of bar on commingling that we talk about when we talk about futures accounts and cleared swaps accounts. The second point about foreign futures and about how Regulation 30.7a just says maintained in a separate account, I really fail to see this argument because 30.7b says and those funds have to be held in a specially designated customer account. And then 30.7e says those funds cannot be commingled with assets of the Futures Commission merchants. So the only way you get to a place where the regulation of foreign futures funds looks like the regulation of Retail Foreign Exchange funds is if you only read 30.7a and wish away the remainder of the provision. As for the National Futures Association rule that was passed in 2006 and the rule explanatory text, the fact that courts may have to decide this question was in response to something that the REFCO foreign exchange participants had raised in the REFCO bankruptcy. The legal landscape has moved on since 2006, putting further distance between Retail Foreign Exchange transactions on one side and commodity contracts on the other. For example, Congress gave the Commission anti-fraud jurisdiction in 2008 over Retail Foreign Exchange transactions, anti-fraud jurisdiction over spot metals transactions in 2010. Congress did not mandate that the funds associated with those transactions be segregated or barred from commingling. And accordingly, Congress did not amend the definition of commodity contract in the bankruptcy code. It did do so, however, for cleared swaps at the same time, which it gave the Commission jurisdiction over in 2010. And then it did accordingly amend the definition of commodity contract in the bankruptcy code. Okay. I see my time is up. Yes. Thank you, Your Honors. Thank you very much. Mr. Bannich. Good morning, Your Honors, and may it please the Court. My name is Terrence Bannich. I represent the Chapter 7 trustee of Peregrine Financial Group, Ira Bodenstein, who is here at Council Table, along with my partner, Bob Fishman, who is here as well. Your Honors, it may be apparent by now that ever since the close of the Secure Leverage Appellant's case-in-chief before the bankruptcy court, when the trustee moved for judgment on partial findings, the appellants have, since that time, been in search of a proverbial glass slipper to make an argument that fits the evidence that they presented at trial and, quite frankly, chose not to present at trial, all without any success thus far. And we believe that the lower courts have gotten it right. The summary judgment issues were ably addressed by Ms. Puri. I won't belabor them, but I'm happy to discuss them. Principal issues I'd like to discuss today are why the trial judgment was correct and should be affirmed, and why the dismissal of the Miller adversary, which has yet not come up yet, was likewise correct and should be affirmed. Before I do that, I'd like to make a brief remark. It's the trustee's view that the appellants have unnecessarily complicated appellate review in this case for several reasons that have perhaps come through in the briefs, the principal one of which is the large part of this appeal is an appeal of a judgment rendered after a trial. Though if you were to read the appellants' briefs, you would scarcely recognize that a trial took place. Well, but there are issues of legal characterization. I mean, we need to know, you know, what kind of account was it, and what were the terms of the account, and things of that nature. But then you still have to answer the question whether it, say, fits within the similar to concept. It seems to me there are legal issues around that one can certainly raise. Certainly. The appeal has got its share of legal issues as well. In terms of the trial judgment, which was my principle, the principal focus of that last remark, was the appellants, it behooves the appellants to argue and convince this court that the bankruptcy court's factual findings, principally about the intent issue, were clearly erroneous. And in the trustee's brief, we marshal the evidence because that's what the bankruptcy court did in a well-reasoned, several page long opinion that deals with the issue of the resulting, the main issue of the resulting trust issue, which is whether or not there was a mutual intent of the parties to form a resulting trust over these trading deposits now. Well, this doesn't look much like regular resulting trusts, a point I believe you've made, where, you know, A pays the money and puts something in B's name, but A actually has the equitable interest still. I'm not sure who's A and B in this case. Correct. Obviously, I would concur with Your Honor's remarks on that, and I believe that the reason for that is because the evidence tends to show that that was, that to form a resulting trust was actually not the mutual intent of the parties. But isn't it fairly obvious, though, that when these customers put their money in the account, this PFG account, and they direct their foreign exchange trades, or they direct their spot metal trades, that, you know, they think of it as their money. Certainly. Not their earnings. I think that is. And intended to be their money, I guess, would be the next question. Right. You know, however, putting money into forex trading and metals trading cannot be divorced from the various warnings that Peregrine was required to, and in fact did give to these appellants, saying, you know, now look, if you trade forex, these various calamities could befall you and this money. So what about the, they emphasize that the word is may, not will, may be treated, you may be an unsecured creditor. Under what circumstances might one be secured? Well, I believe that in a bankruptcy case, now we're talking more generally, not necessarily about this case, but I believe the language used in the forex risk disclosure was, those were a regulatory form of words, and I believe they were not meant to, or intended to tie the hands of every bankruptcy trustee for every, in every subchapter four liquidation that might come afterward. Commodities Futures Trading Commission obviously is a party in interest by statute in these cases, and as every bankruptcy case is, it's a series of negotiated outcomes, and perhaps in this case, the Commodities Futures Trading Commission has a particular position on the way forex creditors should be treated that might differ from another case, and the Commodities Futures Trading Commission might advocate or even push for the bankruptcy court to put forex in a different category for some other unknown reason. For all forex, is there something unique about the contractual arrangements that we have before us here that would push you to say one or the other? No, I believe in this case, I mean, if we're talking about the secure leverage appellants. Right, okay. As opposed to all the other forex customers. Maybe we'll turn to Miller in a minute, yeah. Yes, those appellants, those forex customers are limited to the record, obviously, that they created at the trial, which, I mean, obviously, the bankruptcy judge didn't think much of the power of their evidence, particularly about the intent issue, because under real- Bankruptcy judge finds them not credible on that. Correct, and not only because of the, I would like to point out that it's not credible only because on the one hand, the appellants got up and said, almost in rote fashion, you know, well, of course I intended this money to be mine. Right. But then they admitted on the, simultaneously, and quite frankly on cross-examination, they had to admit that, yes, oh, I read and understood the forex risk disclosure, which said money would not be mine in the event of a, in the event of a bankruptcy of PFG. That'd be the end of the line. Correct, and it was not only the forex risk disclosure. The, there was also something that the parties referred to as the welcome emails, and what they were was once forex customers, such as the appellants, signed up for a forex account, they did all the paperwork, either with their broker or online, and they got to the end, and eventually they received an email that said, you know, more or less, welcome to PFG. Here's your new account number. Here's your login credentials, you know, login name and a password, and at the end of that email, every one of the appellants received, more or less, a distilled down, more colloquially worded version of the forex risk disclosure that said, more or less, you know, if you trade in forex in the event of a bankruptcy, you will, you know, be putting your funds at risk. You could be treated as an unsecured creditor. All the appellants admit, yeah, well, yes, I did receive that email, and I understood it at the time. So that was one of the reasons the bankruptcy judge found that the testimony, oh, I intended the funds to be mine, was not credible. But it's also worth pointing out that, as the district judge noted, in his opinion, that the other reason the bankruptcy judge found the testimony to be not credible was as a result of her evaluation of the appellant's demeanor at trial. There was, in fact, one instance where one of the appellants sort of obstinately refused to acknowledge a prior and consistent statement, and his deposition prompting the bankruptcy judge to just say, well, just admit. You know, you said something different at your deposition. So it's not only the substantive differences that it's impossible for these two things to coexist. I intended the money to be mine, yet I acknowledge I received a form saying it might not be mine, along with the demeanor issues that led her to discount the testimony. So there are. Okay. So let's quickly turn to Miller. Sure. Please. They, the argument there is that you don't need to file a proof of claim, at least one of the arguments, you don't need to file a proof of claim if the money really never is part of the bankruptcy estate anyway. Yes. So that seems like a fairly common sense proposition. What's your response to that? Yes, Your Honor. The not a claim argument has, well, as an initial matter, and as we pointed out, it's that argument has been waived or forfeited at least three times. But if we were, but if we didn't think so, is it your position that if there's even, you know, let's say a legal claim, but not an equitable claim, you have to throw it into the bankruptcy estate and let the bankruptcy court figure out whether it's part of the estate? What's your argument? Well, that's certainly the most prudent approach as a bankruptcy lawyer. You know, if it's going to appear, if there's a claims bar date and then you have to file a claim, you might as well assert it and have someone say that, well, that's not part of the estate. We can just agree that that shouldn't have been in there. But legally, this all comes down to the definition of claim under the bankruptcy code, which is in Section 101, Subsection 5. Now, this is a bifurcated issue that, let's deal with the easy one first, if I might. The complaint in Miller seeks compensatory damages, punitive damages, and attorney's fees. So, a monetary component. No one has ever argued, I believe, at any level that that's not a claim. So, that does not appear to be a dispute. Really, the only issue is whether the constructive trust remedy constitutes a claim. And I would suggest, Your Honor, Your Honors, that this is resolved by the definition of claim in 101.5, Subsection B, which ties the equity, the issue is, what are the equitable remedy gives rise to a right to payment? And you can, and I would say that under this court's decisions in Udell and Apex Oil, cited in our briefs, they're controlling on this. The issue is whether or not the same breach gives rise to the right to payment. So, if the same breach is the reason they want compensatory damages, and that same breach is the reason they want a constructive trust, it's a claim. But you don't even have to- So, you're just saying that the label constructive trust doesn't really help if all it is is a way of saying we want money? Yeah, yes. That's one way to distill Apex Oil in Udell down to a simple phrase, yes. But you don't even have to take my word for it, although I'd be happy if you did. The, if you were to look at the Miller plaintiff's complaint, they make this as clear as day. The complaint says, now I quote, that they seek, quote, to impose a constructive trust so that they, referring to the appellants, may receive payment from the estate apart from any other creditor. In other words, their own complaint binds the notion or the remedy of constructive trust to receiving a right to payment, which means that the constructive trust remedy sought here falls squarely within 101.5B as explicated by Udell and Apex Oil. So, the notion that they don't have to file a claim because they have an equitable remedy seems to focus not so much on the statutory definition. In fact, I would suggest to your honors that they ignore 101.5B, you know, the governing statute, until they file their reply brief. And instead, they just focus on 541D. 541D is, Section 541 deals with what is and is not property of a bankruptcy estate. 541D simply gives effect to a valid pre-petition trust and says if something, if some property is in a valid pre-petition trust, it is not property of the estate. Obviously, 541 does, 541D does not have anything to do with, by its express terms, the claims process. The other statutes and rules clearly do. So, 541D does not say, in fact, would be inconsistent with 101.5B if it did say, well, if you have an equitable remedy, you don't have to file a claim. That would run, that would be flatly inconsistent with what 101.5B says. And obviously, not consistent with this court's decisions in Udell and Apex Oil. Now, there is the other, while we're on the subject of Miller, there's also the second argument that the complaint had the effect of amending the appellant's timely filed proofs of claim, and I'm happy to discuss that if your honors are interested in it. Obviously, we all know what the standards are for relation back, though the district court did note accurately that rule 15 of the civil rules doesn't, by its terms, apply to relation back of claims. Nonetheless, everyone seems to apply that in line. It's not terribly different, though, than 7015. Correct. That's right. Just in the, that's, I'm pointing that out only in passing. So there's two issues here, really, is did it relate back? And under this court's cases, that depends on whether or not the appellant's original proofs of claim, which were timely filed, there was a sufficient link between those facts and the facts alleged in the Miller complaint, which everyone agrees was filed two years after the claims bar date. This strikes me as a level of generality problem, because, of course, ultimately it all arises out of the embezzlement and, you know, the underlying facts of the bankruptcy. At a more granular level, of course, there's some real differences. Contract, there are various tort theories, there are different kinds of proof. So how are we supposed to resolve the correct level of generality? Well, it's quite right, I would say. The, a couple of observations there, the, in this court's decisions, the issue has always come down to whether the proofs of claim put the opposing party, which I suppose nominally is the trustee, on notice of what the Miller appellant's claims really were. In other words, they would have to have told the trustee, saying, well, I represent actually a class of 4X people who think that we're entitled to a trust over these funds because of what Russell Wassendorf did to the futures money. I see that my time's expired. I'm happy to finish addressing- You can wrap up in just a final sentence. Yes, Your Honor. However, you don't need to, I would respectfully suggest, go through any great mental gymnastics to answer that question, because the trustee, in my judgment wisely, when he prepared the specialized proof of claim forms for this case, specifically asked claimants if they had any other claims to assert against the estate. And all of these appellants, and we have a little picture of it in our brief, check the box, no. So, I would suggest that that's dispositive of that issue. Your Honors, thank you very much for your time. All right, thank you. I believe you had a minute left, Mr. O'Rourke. Thank you, Your Honor. A few quick points, thank you, Your Honor. The A and B that Your Honor referred to, we would suggest would be, A would be the customer, B would be Peregrine, and then the equitable title would be retained by the customer in the account. The risk disclosure, and this is directed to a good question that Judge Robner posed, what about this risk disclosure? It does, it is general, it says may, as Your Honor is pointing out, there's a level of generality to it. And as Judge Doyle found in her opinion on the motion to dismiss, it's not part of the customer agreement. It is a government sanctioned form, which It is a form which puts people on notice, which what might happen if there is wrongdoing. Obviously, if Wassendorf got his hands on the Florex money, that would have been a risk that we assume. But also there was a risk, as Wassendorf did, with the segregated funds. Nobody can protect against a crook, but that's the risk. But that does not change the intent. The intent of the plaintiffs always was to maintain control. And this is reflected in the actual handling of the accounts, the record keeping of the accounts. Peregrine counted these deposits as being liabilities, not assets. And again, Your Honor, you can't pledge somebody else's property that's recognized. One last thing, Your Honor, the name of the account, I believe that Chase was a PG Forex account. It was not an operating account. And thank you very much. And we're just trying to get fairness here. We're not trying to get a better deal. We're trying to get a safety. Thank you very much. Thank you very much. Anything further, Mr. John? I'll just attempt to quickly clear up one or two points that my colleague at the Commodity Futures Trading Commission made. I believe that the anti-fraud provisions of the Commodities Act were extended over currencies in the course of the Commodity Futures Modernization Act of 2000, and not later, as she said. With her comments regarding 30.7 foreign futures, we are aware that there is specific language in that provision requiring regulatory separation of those accounts and against co-mingling of those accounts. Again, that's a creature of the commission itself. There's nothing preventing them from applying the same provision or passing that regulation with respect to retail foreign exchange that they themselves has said represents the most vulnerable class of retail investor. The commission, as a matter of policy, and I'll address Zellner very, very quickly. But the important issue with Zellner is, again, not to conflate what Zellner was targeting. Zellner was defining contracts for future delivery under the Commodities Act, that definition under part two of the Commodities Act as it existed in 2003. To extend that logic to commodities interests under section 761 of the code would significantly narrow Congress's intent in passing a manifestly broad provision in the similar agreements clause. So that's something that I think the court should consider about what precedential effect that might have going forward. Generally speaking, as a matter of policy, the irony of this case, Your Honor, is that if our client's money had been in a regulatorily segregated commodity futures account, and there was cross-margining permitted in the contract, incidentally. PFG, without reference to the client, had the power to change monies from retail accounts, forex accounts, to regulated futures accounts at will, which is the case you saw in the Refco case in 2005. Their policy, they conflate their policy of reducing systemic risk with their more core policy of protecting the individual investor, which congressional testimony that we've cited the act itself, which extends all the provisions that the act are supposed to be extended to retail foreign exchange under the Zellner fixed legislation of 08. OK. Thank you very much. Thanks to all counsel. The court will take this case under advisement, and we will take a brief recess.